**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **TERRY DAVIS, individually, and on behalf of all others similarly situated,** | |
| **Plaintiff,** | CASE NO.: |
| **v.** | **CLASS ACTION** |
| **DAILYPAY, INC., and DAILYPAY, LLC** | **DEMAND FOR JURY TRIAL** |
| **Defendants.** | |

## CLASS ACTION COMPLAINT

Plaintiff Terry Davis, ("Plaintiff"), on behalf of himself and all others similarly situated, alleges the following based upon personal knowledge as to himself and upon information and belief as to all other matters, and brings this Class Action Complaint against DailyPay, Inc., and DailyPay, LLC. DailyPay, Inc., and DailyPay, LLC, have coordinated to engage in the illegal practices in Georgia alleged herein. This Complaint refers to DailyPay, Inc., and DailyPay, LLC, together as "Defendants" and "DailyPay."

## I.    BACKGROUND

1.    Georgia has a long-standing history of regulating high-interest lending practices. In 1955, Georgia enacted the Georgia Industrial Loan Act ("ILA") to curb abusive lending practices by unregulated entities. The ILA required lenders issuing consumer loans to obtain a state license and imposed

1

strict interest rate caps, effectively limiting usurious lending.

2.      Despite existing usury protections, payday lending practices began to resurface in Georgia, often circumventing regulations through various schemes.

3.      Payday lending involves offering short-term loans, often for small amounts, with repayment expected on the borrower's next payday. They are regulated because payday lenders often take advantage of borrowers by charging exorbitant fees and lending rates.

4.      In response, Georgia Attorney General Thurbert Baker issued an official opinion (Op. Att'y Gen. 2002-3), observing that the "practice of making 'payday loans' is not a new one" and addressing a "modern variant of this old practice." AG Baker further noted that, under Georgia law, the question of whether a transaction is a loan "depends, not upon the form of words used in contracting, but upon the real intent and understanding of the parties. No disguise of language can avail for covering up usury, or glossing over an usurious contract."

5.      Building on this opinion, in 2004, the Georgia Legislature passed the Payday Lending Act ("PLA"), O.C.G.A. §§ 16-17-2, *et seq.*, which clarified that its usury protections apply to "*all transactions* in which funds are advanced to be repaid at a later date, notwithstanding the fact that the transaction contains one or more other elements." The statute imposes stiff penalties for payday lending by lenders who violate the Act.

6.      Georgia's PLA has been hailed as a "model for preventing payday lending" and has survived multiple challenges by payday lenders who wish to extend expensive short-term financing to Georgia borrowers.

7.      More than a decade after the PLA's passage, yet another "modern

variant" of payday lending—coined "earned wage access" or "earned wage advance" ("EWA")—has been created and offered to consumers to avoid regulation applicable to lenders and loan products. While marketed as a novel financial technology ("fintech") device, in practice, EWA products are garden variety cash advances.

8.    EWA products provide workers, before their payday, with funds that purport to equal or approximate a portion of their unpaid wages. Loaned funds and associated fees are repaid directly from borrowers' payroll providers, eating into borrowers' wages on payday. These EWA products are payday loans by another name and violate the PLA.

9.    This action challenges Defendants' technology-driven attempt to evade the prohibitions of PLA. Defendants extend small-dollar advances, usually for less than $100, and charges fees between $1.99 and $3.99, with the resulting annual percentage rate (the yearly cost of borrowing money) matching loan-shark rates. In exchange, borrowers must agree to allow DailyPay to collect repayment of the advance, and associated fees, from their next paycheck. Borrowers assign all rights and title to their wages owed to DailyPay as collateral and are forced to agree to not interfere with repayment. That assigned collateral is secured by employers' obligations to pay, supported by extensive credit underwriting regarding employers' ability to make payroll. This amounts to secured payday lending in violation of Georgia law and policy.

10.    This Complaint seeks to protect Georgians from DailyPay's predatory lending practices that violate the PLA.

11.    Borrowing money that is repaid on payday is not an innovation; it is a loan. As EWA products have become more popular, the parallels to payday lending are striking. Like payday loans, EWA products trap users in a cycle of

reborrowing that increases their financial distress, all in service of generating revenue for predatory lenders. Considering the substance of the transactions, Defendants' Paycheck Advance transactions constitute loans.

12.    DailyPay's regular business practices systematically violate the PLA with respect to Plaintiff and each member of the putative class to whom DailyPay has extended its usurious loans.

## II.    PARTIES

13.    Plaintiff is an individual, over 18 years of age. At all relevant times, Plaintiff was a natural person and resident of DeKalb County, Georgia.

14.    Defendant DailyPay, Inc., is a Delaware corporation with its principal place of business in New York, New York. Defendant has offered and entered into loan agreements with Georgia consumers, including Plaintiff, since at least 2015, entering into millions of credit transactions. Defendant DailyPay, Inc., has transacted such business using the name and holding itself out as "DailyPay."

15.    Defendant DailyPay, LLC, is a Delaware corporation with its principal place of business in New York, New York. Defendant DailyPay, LLC, has offered and entered into loan agreements with Georgia consumers, using the name and holding itself out as "DailyPay."

## III.    JURISDICTION AND VENUE

16.    This Court has jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because (a) Plaintiff is a member of the putative class, which consists of at least 100 members; (b) Plaintiff is a Georgia citizen; (c) Defendants are Delaware citizens with their principal places of business in New York; and (d) the amount in controversy exceeds the sum of $5 million exclusive of interest and costs. The Court has supplemental jurisdiction, pursuant to 28 U.S.C. §

1367, over claims for expenses of litigation made pursuant to O.C.G.A. § 13-6-11.

17.     Venue is proper in this Court because Defendants are subject to personal jurisdiction in this district and division, and a substantial portion of the acts, omissions, and the courses of conduct giving rise to the claims alleged occurred within this district.

18.     At all times relevant herein, Defendants regularly conducted business in Georgia.

19.     At all relevant times, Defendants extended at least hundreds of thousands of usurious loans to borrowers in Georgia—including in DeKalb County—crediting and debiting bank accounts at Georgia banks belonging to Georgia borrowers with loan proceeds and payoffs for DailyPay users.

20.     At all relevant times, each of Defendants purposely and knowingly directed advertisements and marketed to consumers in Georgia for the purpose of entering and profiting from usurious and illegal loans with the consumers. In so doing, Defendants purposefully availed itself of the privileges and benefits of conducting its business in Georgia.

### IV.    LEGAL BACKGROUND

#### A.    The PLA Was Designed to Curb Predatory Payday Loans to Georgians

21.     Payday lending refers to a short-term, high-cost form of lending, requiring consumers to repay small dollar loans on their next payday.

22.     This form of lending has been around for more than a century, with its defining feature being the varying attempts that lenders have created to evade the law.

23.     Historically, payday lending took the form of "salary" or "wage

buying," where lenders would claim that they were purchasing earned wages, even though they were really loaning money at excessive rates.

24.    To put a stop to this practice, Georgia enacted the Industrial Loan Act ("ILA") regulating payday lending and preventing the various evasions that lenders used to circumvent the law.

25.    Georgia recognized the ability of short-term, high-cost loans to trap borrowers in a cycle of debt.

26.    This occurs because the high fees charged on this form of credit eat into paychecks, which reduces the amount borrowers receive on payday, requiring borrowers to take out new loans to fill the gap created by original loans.

27.    Unfortunately, the ILA proved insufficient to stop payday lending in Georgia and payday loans resurfaced in the 1990s and 2000s in novel forms.

28.    For instance, many lenders described their transactions as "deferred presentments," whereby lenders would advance cash to borrowers in return for a post-dated check for the amount of the advance and a fee, which the borrower agreed the lender could cash on payday.

29.    Recognizing that the ILA did not provide sufficient deterrence to stop these evasions, Georgia enacted the Payday Lending Act to eliminate payday lending in the state.

30.    The PLA "encompasses all transactions in which funds are advanced to be repaid at a later date, notwithstanding the fact that the transaction contains one or more other elements," O.C.G.A. § 16-17-1(a) et seq., prohibits payday lenders from collecting any amounts on payday loans, deems payday loans void and unenforceable, and makes payday lenders liable to borrowers for damages in an amount equal to three times any charges made on

an illegal payday loan, id. § 16-17-3.

31.    Despite the PLA, payday lending has resurfaced yet again in Georgia—this time in the form of EWA providers' cash-advance loan products (including DailyPay's), which offer cash to borrowers in return for their assignment of the borrower's future wages to be repaid from their next payroll in an amount equal to the principal cash-advance loan amount and additional charges.

32.    DailyPay's Paycheck Advance product falls within the scope of the PLA because a Paycheck Advance is a "transaction[] in which funds are advanced to be repaid at a later date." O.C.G.A. § 16-17-1(a).

## V.    FACTS

### A.    DailyPay's Paycheck Advance Product

33.    DailyPay is an app-based lender that makes cash advances to employees whose employers have partnered with DailyPay to facilitate Paycheck Advances.

34.    DailyPay primarily lends to employees who earn hourly wages and are paid on fixed cycles (i.e., every two weeks or monthly), promoting Paycheck Advances as providing access to "wages" that employees have "earned" during the pay period but not yet received.

35.    Some of the companies that have partnered with DailyPay to provide its Paycheck Advance program to employees include large fast food chains such as Taco Bell and Wendy's and retailers like Kroger and Target, many of whom pay wages at or near minimum wage.

36.    DailyPay facilitates Paycheck Advances through a smartphone app-based platform that allows employees to obtain funds via electronic transfer from DailyPay directly to their bank accounts in amounts DailyPay

determines to make available based on its analysis of payroll data.

37.     The fees charged to use DailyPay's product vary by employer and by the speed with which funds are made available. DailyPay uses the following dual fee structure: DailyPay (i) charges $0.00 to $1.99 for Paycheck Advances in which the borrower receives his cash disbursement within 1–3 business days; and (ii) charges up to $3.99 for Paycheck Advances in which the borrower receives his cash disbursement immediately. For some employees, this means that a fee is mandatory whether the employee chooses a Paycheck Advance in which disbursement is immediate *or* occurs within 1–3 business days.

38.     DailyPay collects repayment of the Paycheck Advances it sends employees, along with all associated fees, by requiring employers to route employees' direct deposits to a bank account held by DailyPay. Once DailyPay deducts everything it claims it is owed by the employee, DailyPay deposits remaining amounts in employees' bank accounts.

### i.     *DailyPay Partners with Employers to Deliver and Market Paycheck Advances to Employees*

39.     DailyPay markets its Paycheck Advance program to potential new employers, promising its cash advance program "can help you recruit more employees, increase employee engagement, and improve retention."

40.     DailyPay likewise touts its program is a "tremendous benefit[] to the employer – reduced turnover, increased employee productivity and engagement, and seamless integration across the tech stack – all for a price tag of $0 to the business."

41.     Employers who buy DailyPay's sales pitch and agree to make the Paycheck Advance program available to their employees enter into DailyPay's form Master Services Agreement ("MSA"). Under the form MSAs, the

employer must agree to make DailyPay the exclusive provider of "on-demand pay solutions."

42.    Under the MSAs, participating employers agree to promote DailyPay's Paycheck Advance program to their employees, by *inter alia* identifying the program as "a benefit" offered by the employer, distributing marketing materials created by DailyPay, and taking steps to ensure that DailyPay's own advertising and communications sent by email do not get routed to employees' spam or junk email folders.

43.    To incentivize employer partners to offer the program, compensate them for promoting DailyPay's product, and generate new DailyPay users, DailyPay shares a portion of its Paycheck Advance program revenues with participating employers.

44.    DailyPay's "Quickstart" guide provides guidance on how to promote the Paycheck Advance program, by, for example, encouraging participating employers to display DailyPay "posters in break rooms" and hand out "FAQ cards to employees at the beginning of shifts or during team huddles." DailyPay provides other advertisements to employers promoting its Paycheck Advance products to employees, advertising its benefits, and encouraging employees to sign up.

45.    In its marketing materials directed to employees, DailyPay portrays its Paycheck Advance program as being free. For example, DailyPay directs employees to its "free app" and encourages them to "get started free today" so they can receive money "in the right place, at the right time!"

46.    DailyPay also markets the ability for employees to obtain immediate funds through its program. DailyPay's electronic ads, for example, contain links with the words: "Get paid today."

47.    Ads for Paycheck Advances to be posted in the workplace likewise declare: "Access your pay when you need it!" One such poster includes a screenshot of the DailyPay app that identifies various amounts available for transfer but says nothing about any associated fees. The same poster also says: "Money in the right place, at the right time." Other advertisements directed at employees deliver a similar message, promoting the ability to access money "when you need it" and to "save the day."

48.    The combination of DailyPay's marketing of a cost-free program and the immediate availability of funds cultivates the misimpression that immediate advances are free. In promotional materials provided to employers to share with employee-borrowers, DailyPay touts the ability to "access your pay when you need it" and declares that employees can get started "for free." Several demonstrative advertisements are shown below:



*Figure 1*



*Figure 2*

## Access your pay when you need it.

### What is DailyPay?

DailyPay is a voluntary benefit that allows you access to your earned pay when you need it, with additional ways to help you save.

### Get started for free today!

Go to **dailypay.tm/digital-faq**

 
or text **START** to 66867.


Point your camera here to get the free app

### Why should I sign up for DailyPay?

When you sign up for DailyPay, you can access your pay on-demand. No more waiting for payday!

### How can I reach DailyPay?

You can contact DailyPay by phone, email or chat 24/7

**Phone:** (866) 432-0472
**Email:** employee.support@dailypay.com

**dailypay.**

*Figure 3*

49.    In addition, new users who have just downloaded the app are shown screens highlighting the app's functionality allowing borrowers to "instantly" transfer funds to bank accounts, stressing the ability to "[a]ccess your money when you need it" without disclosing the associated costs.

> ii.    *DailyPay's High-Cost, Short-Term Paycheck Advances Yield Handsome Profits to DailyPay at the Expense of Borrowers*

50.    Under DailyPay's Paycheck Advance program, DailyPay attributes "Unpaid Earnings" to each employee user, defined as his right to payment for regular pay that will be owed but has not yet been paid.

51.    A user accessing the DailyPay app can also view his available balance, which constitutes a portion of his Unpaid Earnings that DailyPay, in its sole discretion, decides to make available to borrowers in the form of a Paycheck Advance.

52.    DailyPay explains the available balance on its website as follows:



*Figure 4*

53. To be eligible for Paycheck Advances, employees consent to their employers sharing payroll data with DailyPay.

54. Likewise, employers who have partnered with DailyPay agree in their MSAs to provide DailyPay "current, accurate" payroll data – including "gross earnings" and "net earnings" – for employee-borrowers on an ongoing basis.

55. As stated above, the fees charged by DailyPay for Paycheck Advances vary based on employer, and are generally (i) between $0.00 and $1.99 for advances issued between 1–3 days, and (ii) up to $3.99 for advances issued immediately.

56. The fees charged by DailyPay to employees for Paycheck Advances grossly exceed the actual expense to make real-time payments. The

actual cost to provide customers with instant access to funds is less than $0.05.[1]

57.    In its program terms, DailyPay differentiates between "Daily Earnings" (defined to mean an employee's requested Paycheck Advance, including fees) and "Amount Provided" (meaning the amount DailyPay sends the employee). For example, if an employee requests a $50 Paycheck Advance for a $2.99 fee, the Daily Earnings is $50 while the Amount Provided is $47.01 (the $50 principal less the $2.99 fee).

58.    When an employee requests a Paycheck Advance from DailyPay, she assigns "all right, title, and interest in and to the related Daily Earnings"—in essence, an assignment of the total amount of the Paycheck Advance and fee—to DailyPay. DailyPay thereby receives a "wage receivable" from the employee against the loan principal ($47.01 in the previous paragraph, plus a $2.99 loan fee).

59.    DailyPay's cash advance transactions, and fees received from consumers, have been the subject of recent regulatory scrutiny and action. DailyPay was recently sued by the State of New York for violating state usury law, *New York v. DailyPay, Inc.*, No. 154851-2025 (N.Y. Sup. Ct. Apr. 14, 2025) ("*New York Action*"). The State of New York attached to its pleading the report of a data expert who reviewed millions of cash advance transactions made by DailyPay to New York residents and found, *inter alia*:

- DailyPay approximately 9.8 million Paycheck Advances to more than 130,000 New Yorkers between October 2020 and December 31, 2024 (the observed period);

---

[1] *Simple, Transparent, Uniform Pricing for All Financial Institutions*, THE CLEARINGHOUSE (showing cost of RTP instant credit transfer at $0.045), available at https://www.theclearinghouse.org//media/new/tch/-documents/payment-systems/rtp_-pricing_02-07-2019.pdf.

- The most common Paycheck Advance was between $25 and $50 with a $2.99 fee;

- DailyPay was paid a fee on approximately 90% of Paycheck Advance transactions;

- DailyPay's fee revenue grew dramatically during the observed period—from $3.35 million in the first eighteen months, up to $9 million in the last nine months.[2]

60.    In a presentation created by DailyPay for external use, DailyPay touts achieving annual recurring revenues exceeding $235 million and having more than 1.2 million active users, and that both recurring revenues and active users are growing at an accelerating rate.

61.    DailyPay's Paycheck Advances impose exorbitant costs of credit on its users. According to the Hasanov Report:

- the median loan duration is only eight days;

- the most common Paycheck Advance was for $20.00;

- the most common Paycheck Advance fee paid was $2.99;

- the median APR in observed Paycheck Advance transactions was 193.47%, and the average APR was 398.59%;

62.    The Consumer Financial Protection Bureau made similar findings in an analysis of data from eight employer-partnered EWA providers. Specifically, the CFPB found:

- "both the number of employer-partnered earned wage product

_____

*See generally* Ex. 1 to Compl. In *New York Action*, Expert Affidavit of Akram Hasanov (the "Hasanov Report"). Though Mr. Hasanov analyzed transactions issued to New York consumers, DailyPay's Paycheck Advance program offering is materially identical in both New York and Georgia.

transactions and the total dollar amount of funds accessed nearly doubled" over a two-year period;

- "around 90% of workers paid at least one fee and approximately 82% of transactions incurred a fee" despite the presence of ostensibly fee-free options;

- "using average inputs from [the CFPB's] sample data, a single earned wage transaction of $106 with $3.18 in fees for a ten-day period . . . equates to an APR of 109.5%. As actual APRs will vary depending on transaction size, fees paid, and duration, a 109.5% APR *understates* APRs for smaller transactions with shorter terms. For example, a $50 transaction with $3.18 in fees for four days equates to a 480.4% APR. This kind of APR variance may explain why studies with access to transaction level data report higher average APRs."[3]

63.    As shown below, Plaintiff's short-term Paycheck Advance transactions from DailyPay carried similar predatory APRs.

### iii.    DailyPay's high costs trap users in a debt cycle in which users become dependent on Paycheck Advances

64.    To maximize its revenues and sustain growth, DailyPay needs employees to frequently obtain Paycheck Advances, and pay attendant fees.

65.    DailyPay's product is designed to grow users' need for more loans: when a borrower obtains a Paycheck Advance, the amount that he receives from his next pay cycle is reduced by the amount of the Paycheck Advance,

---

[3] *Data Spotlight: Developments in the Paycheck Advance Market*, Consumer Fin. Prot. Bureau (July 18, 2024), https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/ ("*Data Spotlight*").

plus fees. As a result, employee borrowers are more likely to need to obtain another Paycheck Advance (and to pay another fee) in their next pay cycle to make up shortfalls that occur on payday.

66.    This creates a cycle of dependency in which the act of obtaining a Paycheck Advance creates a need, in the next pay cycle, for additional funds, thereby necessitating another Paycheck Advance. As the CFPB has explained, "Repeat usage is high and the share of workers using [Paycheck Advance] products each month is increasing."[4]

67.    The result is an increasingly dependent user base. DailyPay has acknowledged the importance of repeat use. In describing its annual revenue per-employee to investors, DailyPay notes that the average employee uses Paycheck Advances twice per week and generates $300.00 in revenue to DailyPay per year.

68.    Indeed, DailyPay expressly encourages repeat use. For example, when an employer's payroll records indicate additional hours worked, DailyPay sends notifications such as: "new earnings in your Daily Pay account!" and "your DailyPay balance just went up!" An exemplar push notification is reproduced below:



*Figure 6*

69.    DailyPay reinforces this messaging in advertisements telling employees they "deserve to be paid every day" and mocking employees that

---

[4] *Data Spotlight*, *supra* note 3.

are "waiting 2 WEEKS for their paycheck???"

70.    Even its name—*DailyPay*—reinforces the notion that employees should receive "daily pay" and, of course, pay fees to obtain access to each advance.

71.    Through these efforts, in conjunction with the structure of the Paycheck Advance product and DailyPay's intentional targeting of employees living paycheck to paycheck, DailyPay is steadily growing its number of workers who are dependent on Paycheck Advances.

72.    The upshot of the repeat use DailyPay has fostered is a steady flow of fees for DailyPay's short-term, high-cost cash advances, from utterly dependent users. Once a worker starts taking multiple Paycheck Advances each pay period, she generally continues to do so, out of necessity. Indeed, DailyPay touts its 96% revenue retention rate and high and growing revenue per-consumer.

73.    But this business model—which relies on heavy users to drive revenue growth through transaction fees—comes at a cost to the workers who pay those fees as costs of credit. Because of the nature of the Paycheck Advance product, many users come to rely on the advances and need them every other day (or more) on average.

74.    Ironically, DailyPay and other industry participants market their products as a low-cost alternative to payday loans.[5] In truth, DailyPay is a wolf

_____

[5] According to a promotional document created by DailyPay: "DailyPay is a Payday Loan Killer and an Overdraft Eliminator." https://www.dailypay.com/wp-content/uploads/AITE-research-infographic.pdf (last visited May 22, 2025). The promotional document referenced in this footnote cites as support a flawed survey that DailyPay paid for and played a significant role in authoring.

in sheep's clothing: extending loans with APRs similar to, and often exceeding, the exorbitantly-priced payday loan products it purports to replace.

75.     The EWA "business model capitalizes on most borrowers' financial precarity, and the user interface of these products makes paying a fee . . . difficult to avoid."[6]

76.     The end result is a product that traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and an ever-increasing reliance on emergency funds from—and the fees that come with—EWA loans.

77.     A recent analysis found consumers who used EWA products took out advances repeatedly, with many taking advances on the same day or the day after repayment and were consequently more likely to overdraft their accounts and be forced to pay overdraft fees. Specifically, the CRL found that 27% of EWA users take out at least 25 loan advances a year, and for 33% of users, the vast majority (80%) of their borrowing is followed by reborrowing within two weeks.[7] This suggests receiving a reduced paycheck (*i.e.*, reduced to pay back EWA loans and fees) necessitated taking out more advances in the following pay period.

78.     Another study found that using EWA products is closely correlated with overdraft fees. "Overdrafts on consumers' checking accounts increased 56% on average after use of an advance product."[8]

---

[6] Candice Wang, Lucia Constantine, Monica Burks, Yasmin Farahi, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, CTR. FOR RESPONSIBLE LENDING, at 7 (Oct. 2024) (hereinafter "*Loan Shark*").
[7] *Id.*
[8] Lucia Constantine, Christelle Bamona, Sara Weiss, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE LENDING, at 6 (Apr. 2024).

> iv. *DailyPay ensures repayment through levels of underwriting, agreements with employer partners and users, and continually monitoring credit risk*

79.    While DailyPay's Paycheck Advance product is financially disastrous for borrowers, it is no doubt a profitable enterprise for the lender. To ensure repayment and maximize profits, DailyPay uses exacting underwriting procedures and creates layers of protection to ensure its Paycheck Advances are repaid. The end result is a repayment rate approaching 100%.

80.    DailyPay leverages its real-time access to payroll data to determine the maximum Paycheck Advance that an employee may obtain to ensure the Paycheck Advance and fees on such transactions will be less than the paycheck routed to DailyPay on the borrower's next payday.

81.    DailyPay uses automated processes to adjust amounts available to lend for factors that could affect its ability to collect on its Paycheck Advances, such as "the impacts of any taxes, benefits, and garnishments for each unique employee."

82.    And if an employer provides inaccurate payroll data that causes DailyPay to make Paycheck Advances exceeding an employee's total pay, under the MSAs, the employer is responsible to pay the shortfall.

83.    DailyPay receives legal protections for amounts it is owed. When an employee obtains a Paycheck Advance, he or she must assign to DailyPay the "right, title, and interest in and to" future wages in an amount equal to the Paycheck Advance plus any associated fees. In addition, the borrower simultaneously agrees that DailyPay "can stand in [his or her] shoes and receive payment for the Daily Earnings" from the employer.

84.    Upon enrollment in DailyPay's program, an employee must

arrange for his employer to direct deposit his pay to an "account bearing the DailyPay Routing and Account Number" (*i.e.*, a DailyPay bank account). To request an advance, the borrower must agree that he "will not take any action"—such as "redirecting payments, or placing or allowing placement of a lien or security interest on any DailyPay Earnings"—that has an "adverse effect on [DailyPay's] ability to collect on or retain any Daily Earnings."

85.    Likewise, employees promise to "take all actions, including the execution of documents requested by [DailyPay], to preserve and protect [its] right, title, and interest to any Daily Earnings." In that vein, if an employee is paid directly on a paycheck that included money purportedly owed to DailyPay, the employee is required under DailyPay's terms to "notify [DailyPay] immediately and hold the amount in trust for our benefit."

86.    For much of the class period, DailyPay included in its program terms the right to debit an employee's bank account directly to collect amounts owed but not repaid due to error, fraud, disputes, or breaches of DailyPay's agreements.

87.    Separately, DailyPay's standard MSAs with employers provide that the employer will make all payroll payments owed to employees that use the Paycheck Advance program directly to DailyPay. On payday, employers who partner with DailyPay deposit workers' entire pay in a DailyPay bank account, from which DailyPay collects all Paycheck Advances and fees owed before passing any remaining amounts to the borrower.

88.    DailyPay guards against the risk of lending to unemployed persons by requiring its employer partners to "immediately deactivate" DailyPay user accounts when a user has been terminated by the employer.

89.    Since DailyPay collects repayment of loaned funds directly from

employees' wages via employer payroll distributions, DailyPay's primary risk of loss on the loans it issues is that an employer will not make payroll.

90.    DailyPay guards against that risk by employing layers of underwriting of its employer partners to ensure DailyPay collects repayment of loaned funds. For instance, DailyPay reviews data analytics metrics for its employer partners created by Dun & Bradstreet, a professional services firm that assesses companies' viability and quantifies the risk that a company might go out of business or file for bankruptcy (and, importantly for DailyPay's purposes, potentially fail to meet payroll obligations).

91.    DailyPay accepts new employers only when Dun & Bradstreet's analyses reflect a low probability that the company will go under. In addition to the third-party analysis, DailyPay considers employers' credit rating, liquidity, revenues and profits, and balance sheet, among other factors.

92.    For existing employer partners, DailyPay continuously monitors their credit quality over time (by, *inter alia*, reviewing similar data as discussed above) to ensure repayment of loaned funds going forward. Under the MSAs, employers must regularly submit to DailyPay balance sheets, audited financial statements, and credit applications (the forms of which are created and controlled by DailyPay).

93.    Under the MSAs, employers are legally obligated to repay DailyPay for any Paycheck Advances issued under the program. Failure to make its contractually required payments may result in DailyPay taking legal action against the employer.

94.    Through these comprehensive credit underwriting measures, DailyPay collects repayment on substantially all of the Paycheck Advances it issues. According to an analysis of DailyPay transactional data for New York,

DailyPay collected between 99.92% and 99.99% of the loaned funds it issues.

### B.    DailyPay's Loans to Plaintiff

95.    Plaintiff is, and has at all relevant times been, a Georgia resident.

96.    DailyPay extended loans to Plaintiff in the form of Paycheck Advance loan transactions like those discussed above.

97.    All of the loans issued by DailyPay to Plaintiff were for less than $3,000.00 and were advanced to be repaid at a later date.

98.    The loans to Plaintiff were not subject to any of the exceptions permitted under O.C.G.A. § 16-17-2(a).

99.    Plaintiff paid DailyPay interest in the form of transfer fees (including so-called "Instant Transfer" fees and "Next Business Day ACH Transfer" fees) to obtain Paycheck Advances from DailyPay.

100.    A small selection of Paycheck Advances made by DailyPay to Plaintiff (and accompanying transfer fees) are shown in the below table, with the cost of credit and APR included:

| Date | Principal Amt. | Transfer fees | Loan period | APR |
|---|---|---|---|---|
| 10/7/24 – 10/18/24 | $22.50 | $2.49 | 11 days | 367.2% |
| 10/8/24 – 10/18/24 | $33.50 | $2.49 | 10 days | 271.3% |
| 10/10/23– 10/18/24 | $49.50 | $2.49 | 8 days | 229.5% |
| 10/11/24– 10/18/24 | $33.95 | $2.49 | 7 days | 382.4% |

101.    Plaintiff has received dozens of usurious loans from DailyPay since he started using the service. For much of the relevant period, Plaintiff took

out a loan each pay period and was forced to take out more loans immediately after repayment of his last loan.

102.    The cycle of lending, combined with DailyPay's expensive transfer fees, erodes Plaintiff's take-home pay each month. Indeed, for many months of Plaintiff's use of DailyPay, more than half of Plaintiff's net earnings (*i.e.*, gross earning minus taxes and deductions) was transferred to DailyPay to repay Paycheck Advances.

103.    The fees attendant to Defendant's loans are immediately and directly connected to DailyPay's extensions of credit to Plaintiff.

## VI.    CLASS ACTION ALLEGATIONS

104.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23(b) on behalf of himself and all other persons similarly situated and the general public. The proposed "Class" is defined as follows:

> All Georgia residents who entered into an agreement with DailyPay to use its earned wage advance (or substantially similar) product, in which DailyPay was paid a finance charge (including, without limitation, a transfer fee).

105.    Expressly excluded from the Class are: (a) any Judge presiding over this action and members of their families; (b) DailyPay and any entity in which DailyPay has a controlling interest, or which has a controlling interest in DailyPay, and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Class.

106.    Plaintiff reserves the right to amend the Class definition if further investigation and discovery indicates that the Class definition should be

narrowed, expanded, or otherwise modified.

## Numerosity and Ascertainability

107.    Plaintiff is unable to state the precise number of members of the class because such information is in the exclusive control of DailyPay. DailyPay's scheme has harmed and continues to harm the members of the Class. Plaintiff believes that there are over 1,000 members of the proposed Class. The members of the proposed Class are so numerous that joinder of all members is impracticable. DailyPay has made at least hundreds of thousands of loans, and Plaintiff estimates there are, at least many thousands of consumers in the Class. As a result, members of the Class are so numerous that joinder of all class members is impracticable. The exact size of the proposed class, and the identity of the members thereof, will be readily ascertainable from the business records of DailyPay.

108.    The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in DailyPay's possession, custody, or control.

## Commonality

109.    There are common questions of law and fact affecting the rights of each Class member and common relief by way of damages. The harm that DailyPay has caused or could cause is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

- Whether Plaintiff and Class members are subject to the protections and limitations of the PLA;

- Whether DailyPay's business consists in whole or in part of

25

making loans of $3,000.00 or less;

- Whether DailyPay's Paycheck Advances constitute "payday lending" or "loans" as those terms are understood under the PLA;

- Whether DailyPay entered into standard form loan agreements with Plaintiff and members of the Class;

- Whether DailyPay's loans exceed Georgia's statutory usury cap;

- Whether DailyPay's loan agreements are void *ab initio* by operation of O.C.G.A. § 16-17-3;

- Whether Class members are entitled to actual or statutory damages for the aforementioned violations and, if so, in what amounts;

- Whether DailyPay should be enjoined from continuing its lending practices in the manner challenged herein;

- Whether DailyPay is subject to punitive damages, and, if so, the proper measure of such damages and remedies to which Plaintiff and the Class are entitled; and

- Any declaratory and/or injunctive relief to which the Class is entitled.

### Typicality

110. The claims and defenses of Plaintiff are typical of the claims and defenses of the Class because Plaintiff is a Georgia resident and his loan agreements with DailyPay are typical of the type of payday loans that DailyPay normally provides to Georgia residents. Additionally, DailyPay uses the same or substantially similar standard form loan agreement in all of its lending transactions. The documents involved in the transaction were standard form documents and the violations are statutory in nature. Plaintiff suffered

damages of the same type and in the same manner as the Class he seeks to represent. There is nothing peculiar about Plaintiff's claims. Plaintiff has no interests antagonistic to the interests of the other members of the Class.

### Adequate Representation

111.   Plaintiff will fairly and adequately assert and protect the interests of the Class. Plaintiff has hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Class, and Plaintiff has no conflict of interest that will interfere with maintenance of this class action.

112.   Plaintiff and his counsel are committed to vigorously prosecuting the action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel have interests adverse to those of the Class.

### Predominance and Superiority

113.   The common questions of law and fact set forth herein predominate over any questions affecting only individual Class members. A class action provides a fair and efficient method for the adjudication of this controversy for the following reasons which is superior to the alternative methods involved in individual litigation:

- The Class is so numerous as to make joinder impracticable. However, the Class is not so numerous as to create manageability problems. There are no unusual legal or factual issues that would create manageability problems. Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications against Defendants when confronted with incompatible standards of conduct;

- Adjudications with respect to individual members of the Class

could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and

- The claims of the individual Class members are small in relation to the expenses of individual litigation, making a Class action the only procedural method of redress in which Class members can, as a practical matter, recover.

114.    The proposed Class fulfills the certification criteria of Federal Rule of Civil Procedure 23(b)(3).

## FIRST CAUSE OF ACTION
### (Violations of the Georgia Payday Loan Act, O.C.G.A. §§ 16-17-1, *et seq.*)
### (On Behalf of Plaintiff and the Class against Defendant)

115.    Plaintiff re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1–110 above.

116.    Plaintiff brings this claim individually and on behalf of the Class.

117.    Plaintiff and each member of the Class received loans of $3,000.00 or less to be repaid at later dates; with such loans being in violation of the PLA.

118.    Defendants are engaged in the business of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less. O.C.G.A. § 16-17-2(a), (b).

119.    Defendants are not banks or credit unions and are not licensed under any Georgia law to engage in that business.

120.    Defendants do not meet any of the statutory exceptions to the general prohibition against the making of loans of $3,000.00 or less. See O.C.G.A. § 16-17-2(a)(1)-(4).

121.    Plaintiff and the Class are borrowers who obtained cash-advance loans from Defendants and paid interest and other charges in connection with

those loans.

122.    Defendants advanced funds to Plaintiff and each member of the Class to be repaid at a later date.

123.    Plaintiff and each member of the Class were damaged by Defendants' violations of the PLA in the form of money due to excessive fees and excessive interest rates charged Plaintiff and Class members on loans and other damages recoverable at law.

124.    Defendants' conduct described herein violated and continues to violate the PLA, which means that the loans of Plaintiff and the Class were void *ab initio*, that Defendants are barred from collecting any amounts on those loans, and that Defendants are additionally liable to Plaintiff and the members of the Class for three times the amount of any interest or other charges, and attorneys' fees and costs. *See* O.C.G.A. § 16-17-3.

125.    Accordingly, Plaintiff, individually and on behalf of the Class, requests: (i) payment of all principal of any loans repaid in the last 20 years; (ii) payment of triple the amount of any tips, fees, or other amounts repaid in the last 20 years; (iii) a declaration that Plaintiff's and the Class members' loans are void ab initio; (iv) and an order prohibiting Defendants from attempting to debit Plaintiff's or the Class members' bank accounts to repay any cash advances.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, on behalf of the Class, Plaintiff prays for judgment against Defendants as follows:

a. That the Court determine that this action may be litigated as a class action and that Plaintiff and his counsel be appointed class representative and class counsel, respectively;

b. That the Court enter judgment against DailyPay and in favor of Plaintiff and the Class on all counts;

c. An order awarding the members of the Class actual, statutory, treble, and all other damages available by law, with pre- and post-judgment interest;

d. An order providing Plaintiff and the members of the Class restitution for any principal, interest, fees, or other charges paid to Defendants;

e. An order declaring the cash advances that Plaintiff and the Class members obtained were or are void ab initio;

f. An order preventing Defendants from attempting to collect their cash advances from Plaintiff and the Class members;

g. That the Court enjoin DailyPay from continuing to engage in predatory payday lending practices in violation of the PLA;

h. That DailyPay be required by this Court's Order to compensate Plaintiff's counsel for their attorneys' fees and costs of suit, and that DailyPay be ordered to bear the cost of notice to the absent class members, as well as the administration of any common fund;

i. That the Court award interest as allowable by law;

j. That the Court award all costs of suit; and

k. That the Court award such other and further relief as the Court may deem just and proper.

Dated: June 6, 2025          Respectfully submitted,

*/s/ Christopher B. Hall*
Christopher B. Hall
Georgia Bar No. 318380
chall@hallandlampros.com
Adam T. Mills
Georgia Bar No. 123930
adam@hallandlampros.com
HALL & LAMPROS, LLP
300 Galleria Parkway, Suite 300
Atlanta, GA 30339
Telephone: (404) 876-8100
Facsimile: (404) 876-3477

Joshua R. Jacobson
Georgia Bar No. 471903
joshua@jacobsonphillips.com
Jacob L. Phillips (*pro hac vice application forthcoming*)
jacob@jacobsonphillips.com
JACOBSON PHILLIPS, PLLC
2277 Lee Rd Ste B
Winter Park, FL 32789
Telephone: (321) 447-6461

Lee Lowther (*pro hac vice application forthcoming*)
llowther@cbplaw.com
Courtney Ross Brown (*pro hac vice application forthcoming*)
cbrown@cbplaw.com
CARNEY BATES & PULLIAM, PLLC
One Allied Drive, Ste. 1400
Little Rock, AR 72202
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

*Attorneys for Plaintiff Terry Davis and the Proposed Class*

31